## HOOKER CHEMICAL COMPANY, RUCO DIVISION, Petitioner in 79–2194,

v.

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION II, Respondent in 79–2194.

## TENNECO CHEMICALS, INC., Park 80 Plaza West-1, Saddle Brook, New Jersey 07662, Petitioner in 79–2567,

v.

## Eckardt C. BECK, Regional Administrator, United States Environmental Protection Agency, Region II, 26 Federal Plaza, New York, New York 10007; United States Environmental Protection Agency, 401 M Street S.W., Washington, D.C. 20450, Respondent in 79–2567.

Nos. 79–2194, 79–2567.

United States Court of Appeals, Third Circuit.

Argued Nov. 3, 1980.

Decided Feb. 23, 1981.

John C. Murphy, Jr. (argued), Charles F. Lettow, Janet L. Weller, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., David A. Giannotti, Houston, Tex., Bruce L. Harrison, Capehart & Scatchard, P.A., Moorestown, N.J., for Hooker Chemical Co.

Nancy L. Long (argued), Donald W. Stever, Jr., James W. Moorman, Dept. of Justice, Washington, D.C., Michelle Corash, Todd Joseph, Jane Axelrad, Environmental Protection Agency, Washington, D.C., for Environmental Protection Agency.

Allan J. Topol (argued), Edward R. Mackiewicz, Steven S. Rosenthal, Covington & Burling, Washington, D.C., George S. Flint, Tenneco Chemicals, Inc., Saddle Brook, N.J., for Tenneco Chemicals, Inc.

Before GIBBONS and WEIS, Circuit Judges and BECHTLE, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

The EPA issued orders against several chemical companies stating that they had discharged vinyl chloride in violation of regulations and directing compliance in the future. After the Hooker Chemical Company and Tenneco Chemicals, Inc. filed petitions for review, the agency withdrew the orders against those two companies, but reserved the right to take further enforcement action with respect to the emissions. The EPA then contended that the case had become moot. We reject that contention, but decline review because the matter is not ripe for adjudication.

Over a period of time beginning in January 1977 and extending through May 16, 1979, a number of relief valve discharges of vinyl chloride occurred at the Hooker Chemical Company plant in Burlington, New Jersey. This information was reported to the appropriate regional office of the EPA in accordance with the relevant regulation, 40 C.F.R. § 61.65(a) (1979). Finding

* Honorable Louis Charles Bechtle, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

that the discharges had violated § 112 of the Clean Air Act, 42 U.S.C. § 7412 (Supp. I 1977), Region II of the EPA issued an "order" on July 2, 1979. The order directed Hooker to take steps necessary to prevent further violations, and to comply with the provisions of 40 C.F.R. § 61.65(a), which prohibit vinyl chloride emissions in non-emergency situations.[1]

Accompanying the order was a letter signed by the Acting Director of the Enforcement Division in Region II, based in New York City. After quoting the regulation, the letter stated in part:

"EPA construes the exception for emergency relief discharges narrowly.... [T]o be considered an emergency, a source must demonstrate that it could not reasonably have been expected to anticipate the discharge and then to prevent it or contain it. As a minimum, the source must demonstrate that the discharge could not have been prevented by implementing any of the following procedures."

The letter then listed such matters as employee training programs, proper inspections and maintenance, proper design and operation of process and control equipment, and installation and operation of all control equipment, which should be utilized to ensure compliance with the vinyl chloride standard.

The letter went on to advise: "The preamble to the proposed vinyl chloride standard [also] lists several measures a [facility] can reasonably be expected to take to prevent relief valve discharge. See 40 Fed. Reg. 59539 (December 24, 1975). These measures include, but are not limited to, venting vinyl chloride discharges to a gas holder during upset conditions and ultimately to a recovery system."

On August 30, 1979, Hooker petitioned this court for review of the EPA's order, and on October 5, the Acting Regional Administrator, referring to the order of July 2, 1976, notified Hooker that "[t]he above referenced order is hereby withdrawn." The withdrawal was accompanied by a letter from the Regional Director of the Enforcement Division, stating in part:

"EPA has no intention to seek judicial relief against Hooker for possible violations of this Order prior to the time of its withdrawal. However, in no event should this withdrawal be construed to relieve Hooker of liability for violations of the underlying regulatory provisions set forth at 40 CFR § 61.65(a). In fact, it is EPA's continuing belief that Hooker has violated the requirements of 40 CFR § 61.65(a). EPA will take appropriate enforcement measures necessary to remedy any such violations which have occurred at the referenced polyvinyl chloride plant."

Tenneco Chemicals received two similar orders and later withdrawals from the same regional office of the EPA. Tenneco filed a petition for review with the United States Court of Appeals for the Second Circuit, which then transferred the matter here. Other chemical firms received letters identical to that of July 2, 1979, but did not petition for review. These companies did not receive withdrawal notices.

Hooker and Tenneco assert that not until after the 1977 amendments to the Act was the agency given the power to establish design, equipment, work practice, and operational requirements. See Clean Air Act Amendments of 1977, Pub.L.No.95–95, § 110, 91 Stat. 703 (codified at 42 U.S.C. § 7412(e) (Supp. I 1977)). Before these amendments became effective, the EPA lacked authority to direct adherence to work practices as part of emission standards. Adamo Wrecking Co. v. United States, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978). Imposition of such requirements, although within the agency's power since 1977, requires notice and hear-

---

1. The regulation provides, in pertinent part:
    (a) Except for an emergency relief discharge, there is to be no discharge to the atmosphere from any relief valve on any equipment in vinyl chloride service. An emergency relief discharge means a discharge which could not have been avoided by taking measures to prevent the discharge. 40 C.F.R. § 61.65(a).

ing procedures that the agency has not yet undertaken. *Id.*

As ground for appeal, Hooker and Tenneco contend that the EPA transmittal letter of July 2, 1979 requires the kind of equipment, design, and operational changes that could be imposed only after formal rule making proceedings. In effect, petitioners say the enforcement division of EPA is amending the regulations without following proper procedures. Moreover, Hooker asserts that as to the bulk polymerization process it utilizes, there is no known technology available to implement several of the required changes.

The EPA does not address these contentions, arguing instead that this litigation became moot when the orders were withdrawn and, therefore, the petitioners are asking for an advisory opinion. The agency concedes that the record does not provide an adequate basis to adjudicate whether violations of the relief valve standard occurred, and that this deficiency prompted the withdrawal of the orders. Hooker and Tenneco insist that the cases are not moot and point to our opinion in *Dow Chemical Co. v. EPA*, 605 F.2d 673 (3d Cir. 1979). We begin with an examination of the order that the EPA issued.

The Clean Air Act, 42 U.S.C. §§ 7401–7642 (Supp. I 1977) (formerly codified at 42 U.S.C. §§ 1857–1858a (1976)), authorizes the administrator to issue an order requiring a person who has violated an emission standard under 42 U.S.C. § 7412(c)(1)(B) to comply. 42 U.S.C. § 7413(a)(3). The statute does not provide for self-enforcement. If the order is not obeyed, the administrator is required to file a civil action for an injunction, a civil penalty, or both. 42 U.S.C. § 7413(b).

The Act also provides that up to $25,000 per day may be levied, as well as a year's imprisonment, for a knowing violation of an administrator's order authorized by § 7413(a). 42 U.S.C. § 7413(c)(1)(B). Once an order issued under § 7413(a) is violated, proceedings appear to be mandatory. These consequences are strong arguments for the finality of such orders for review purposes, a proposition we need not and do not reach here. *See Harrison v. P.P.G. Industries*, 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980).

The EPA has withdrawn the challenged orders, has "abandoned any cause of action under section 113(b)(1) [42 U.S.C. § 7413(b)(1)], for violations of the orders and has rendered the orders null and void." Brief for EPA at 10. The agency, however, continued its investigation of the facts surrounding the reported emissions, reserving the right to take action with respect to Hooker and Tenneco in the future, although it "does not intend to reissue the orders." Brief for EPA at 10. Specifically, the administrator remained free to bring an enforcement action in the district court for an injunction or a civil penalty, § 7413(b)(3), for violation of the regulation, 40 C.F.R. § 61.65(a), rather than for violation of the order.[2] Similarly, resort to a criminal proceeding is available. 42 U.S.C. § 7413(c)(1)(C).

The seeds of controversy thus remain, according to Hooker and Tenneco, and they argue that *Dow Chemical* requires that we entertain their appeals. We find significant differences, however, between that case and the one at hand.

In *Dow*, the EPA issued a regulation requiring the submission of studies on testing of certain chemicals. After Dow filed a petition for review, the EPA withdrew the challenged rule because of procedural irregularities. Contending that the appeal had become moot, the agency nevertheless stated that it did not intend "to change its interpretation of the scope of its statutory authority." *Id.* at 678. In fact, it renewed the rule making process by proposing another regulation that would take the same

---

**2.** After oral argument in this case, the EPA instituted enforcement proceedings pursuant to 42 U.S.C. § 7413(b) in the district court against Tenneco. *United States v. Tenneco Chemicals, Inc.*, No. 80–4141 (D.N.J., filed Dec. 30, 1980). We have been informed that some of the discharges which were the subject of the withdrawn orders here are included in that action, along with other emissions not previously included.

substantive position as that adopted in the withdrawn rule. This adherence to its prior position was a factor that counseled against a finding of mootness, since the controversy thus maintained its adversarial, non-hypothetical character. We were also troubled by the withdrawal and repromulgation of the regulation, actions of the agency that attempted to control the timing and venue of judicial review—a concern which petitioners have raised here as well.

In *Dow*, moreover, there was a continuing impact on the company even in the absence of the rule, because the EPA remained steadfast in its position. This created a continuing threat of agency action that affected the company's research and development programs. Additionally, the issue raised there was purely one of statutory interpretation, capable of resolution without further factual development.

The case at hand, by contrast, does not include an adamant stance by the EPA on its interpretation of the regulation. The uncertainty as to the agency's position after the withdrawal of the orders makes the issue more speculative than in *Dow*. The continuing effect of the interpretation is also questionable, because in withdrawing the orders the EPA conceded that it had an insufficient basis in fact. That acknowledgement to some extent is a repudiation of the enforcement staff's construction of the regulation, which purported to require no additional factual predicate. As to the lingering effects of the accompanying letters, the EPA correctly states, "This correspondence obviously has no mandatory effect." Brief for EPA at 42. Moreover, the interpretation in the letters is of a lower order than a regulation and would be given less weight by a court in any event. *See Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 664 (D.C.Cir.1978).

■ Although the factors that avoided a finding of mootness in *Dow* distinguish it from the matter before us, it does not follow that this case is moot. A controversy still smoulders when the defendant has voluntarily, but not necessarily permanently, ceased to engage in the allegedly wrongful conduct. *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed.2d 1303 (1953). We have held that an appeal will not be deemed moot if there is a reasonable likelihood that the parties will contest the same issues in a subsequent proceeding. *Klein v. Califano*, 586 F.2d 250, 255–56 (3d Cir. 1978) (in banc); *American Bible Society v. Blount*, 446 F.2d 588, 595 (3d Cir. 1971).

■ Although there is no statement from the agency that it does not intend to deviate from the position taken in its July 2, 1979 letter, EPA did not jettison its contention that violations of the regulation did occur. An enforcement proceeding has been instituted against Tenneco as a result of the vinyl chloride discharges, and it is not unreasonable to assume that some, if not all, of the same issues will be contested in that litigation. Since we find that the EPA is at least "free to return to [its] old ways," *United States v. W. T. Grant, supra* at 632, 73 S.Ct. at 897, we decline to say that the withdrawal of the order was sufficient to moot the controversy.

■ Despite the fact that the action should not be dismissed as moot, we are persuaded that review of the agency action should be declined at this time. *In Wearly v. FTC*, 616 F.2d 662 (3d Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 81, 66 L.Ed.2d 25 (1980) we reviewed the ripeness doctrine as expounded in the trilogy of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Association, Inc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Those cases explain that agency action must be scrutinized to determine the fitness of the issues for judicial resolution. *Wearly v. FTC, supra* at 666. In this connection, there must be an inquiry into whether the controversy generated is essentially legal in nature or whether further factual amplification is necessary. In addition, potential hardship to the parties must be assessed in the event review is denied. *Id.*

In withdrawing its orders, the EPA admitted that further investigation was necessary before it could properly act. As the litigation has developed, whether there is sufficient justification for sanctions will be determined in the district court proceedings against Tenneco. It remains to be seen whether similar action will be taken against Hooker. Because of the factual gap that exists, a strictly legal issue is not presented to us. *See Wearly v. FTC, supra* at 667; *Exxon Corp. v. FTC*, 588 F.2d 895 (3d Cir. 1978). This is not a case where the sole issue is the authority of the agency to promulgate a regulation and where further delineation of the circumstances is not needed to shape the issues. *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 521 (3d Cir. 1976).

Absent an application of the emergency relief valve provisions, there is no definitive exposition of the EPA's construction of the regulation before us. As in *Wearly*, the agency has yet to take a position with respect to an interpretation of the regulation that can be deemed as "final" in the present posture of this case. *Id.* at 667; *Dresser Industries v. United States*, 596 F.2d 1231, 1235 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980). The informal demands in the transmittal letters impose no legal obligation to comply, and are not final agency action. In view of the continuing investigation after withdrawal of the orders, review of the agency's conduct at this time would be an interference with an active administrative proceeding. *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 161 (7th Cir. 1976).

We are not convinced, either, that the hardship test has been met. Although Hooker may be apprehensive of the policy stance adopted by EPA's enforcement division, the company is not required to take any action at this time beyond that required by 40 C.F.R. § 61.65(a).[3] Tenneco, of course, is free to attack the EPA position in

the district court litigation. *Cf. A. O. Smith Corp. v. FTC, supra* at 524. The absence of a requirement to comply with the orders of the EPA at this time, therefore, militates against a finding that the hardship factor has been met. *Wearly v. FTC, supra* at 666. Nor can we say that the governmental activity "by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974).

This case is too dependent upon the presentation of a complete circumstantial background for a satisfactory resolution of the issues at this stage. The petitioners are in no worse position than they would be had we struck down the order because of an insufficient factual record. We decline to review the agency action at this point and, accordingly, the petition for review will be denied.

---

3. Hooker invokes *Adamo Wrecking, supra*, in challenging the employment of § 61.65(a) to support a § 113(a) emission standard violation. Because the § 113 order has been withdrawn, and Hooker would be able to raise the alleged

infirmity as a defense in enforcement proceedings, we would be rendering an advisory opinion to consider the matter on the merits at this stage.